COMBINED PROFESSIONAL
RESOURCES, INC.,
Plaintiff,

v.

LIMECO, INC., Defendant.

No. 90–2716–CIV–DAVIS.

United States District Court,
S.D. Florida.

June 22, 1992.

Robert M. Hustead, Ms. Magolomick, Elizabeth Russo, Miami, Fla., for plaintiff.

Susan H. Aprill, Mr. Houston, Miami, Fla., for defendant.

## DECISION OF THE COURT

THEIS, District Judge, Sitting by Designation.

This is an action for damages under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. Plaintiff alleges that the defendant failed to account properly and make full payment promptly of the proceeds of the sales of fruit delivered by plaintiff to defendant to be graded, packed, sold and shipped. This matter was tried to the court on February 18–21, 1992. The court heard the testimony of numerous wit-

nesses and had the opportunity to evaluate their demeanor and credibility. The parties submitted additional evidence by way of deposition following the conclusion of the trial. The court has considered the exhibits and the comprehensive pre-trial and post-trial filings and now issues the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Plaintiff Combined Professional Resources, Inc. (Combined) is a producer of limes and mangoes in Florida. Its president is William Planes.

2. Defendant Limeco, Inc. is a packer and shipper of Florida limes. Its president is Herbert Yamamura.

3. Combined was a producer of limes and mangoes from July 1988 through the summer of 1990.

4. Planes approached Limeco in July 1988 when he was attempting to locate a packing house to handle Combined's produce. Beginning in July 1988, Combined began delivering to Limeco limes to be processed, graded, packed, sold and shipped by Limeco.

5. In August 1990, Combined ceased doing business with Limeco. Planes opened his own packing house, Florida Lime Growers, in August or September 1990.

6. At all times relevant to this lawsuit, Limeco was licensed under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq., as a handler and wholesaler of fresh fruits and vegetables. Limeco is not licensed as a commission merchant or broker. Defendant's Exh. 3.

7. Limeco operates a packing house in Dade County, Florida where it packs, grades, markets and ships its own fruit and the fruit of other growers.

8. Federal regulations dictate the size of lime containers. *See* 7 C.F.R. § 911.329. A "pony" box must have specified inside dimensions and contain not less than 10 pounds net weight of limes. A "bruce" box must also conform to specified dimensions and contain not less than 38 pounds net weight of limes.

9. Limeco's scales on the packing line are set to account for shrinkage, thereby ensuring the minimum net weight required by the regulations. The scales are set at 11 pounds for pony containers (10.25 pounds of limes and .75 pounds for the empty container). The scales are set at 40 pounds for bruce containers (38.5 pounds of limes and 1.5 pounds for the empty container).

10. Regulations dictate the quality standards for packed containers of limes. To meet the U.S. combination grade, each container of limes must consist of at least 75%, by count, of U.S. No. 1 grade limes and no more than 25% U.S. No. 2 grade. 7 C.F.R. § 911.344(a)(2).

11. Limeco pays each grower by the bushel sold, part of which is packed and sold as U.S. combination grade and part of which is not. Each lot of fruit that is received is weighed at Limeco. The total number of pounds of fruit delivered is converted to number of bushels (a bushel of limes equals 55 pounds).

12. On a daily basis, Yamamura examines a random sample of at least 100 pieces from each grower's lot of limes to estimate what percent of the lot will pack out as U.S. combination grade. Yamamura employs what was called a "conversion factor" of .2 bushels per pony and .72 bushels per bruce. This conversion factor is a method of performing a rough calculation of the anticipated daily packout, based on the number of bushels delivered per day. These rough calculations are adjusted to conform to the actual daily packout. At the end of the day, using the daily packout inventory, Yamamura calculates the final packout for each grower. If the actual number of containers packed that day exceeds or falls short of his estimate, he adjusts the figures for all growers uniformly.

13. Whole packed limes bring the highest market prices. Limes that do not make the U.S. combination grade are known as "culls" or "juice limes." Depending on the available market, culls may be sold whole in nonconforming containers (known as "banana boxes") on the local market, pro-

cessed as juice, or dumped as having no commercial value. Juice limes bring a lower price per bushel than whole fresh limes. Juice processing occurs only when a juice plant is operating and accepting limes. During periods of oversupply during the summer months, many limes may be dumped.

14. After grading and packing, Limeco sells or causes others to sell the limes it handles.

15. The price for limes varies on a daily basis.

16. Because they are highly perishable, limes must be disposed of without undue delay.

17. Limeco sells the produce it handles either f.o.b. Miami or through consignment houses.

18. Each Friday, Yamamura sets the prices Limeco hopes to obtain during the next week for the produce it wholesales. Limeco frequently sells limes at a lower price than initially listed, due to heavy competition in the market.

19. Many of Limeco's sales are f.o.b. Miami to identified customers, which typically yield the highest return.

20. Limeco also sells produce for which it has been unable to find buyers through consignment houses at terminal markets in major cities. Limeco's consignment sales as a percentage of total sales vary seasonally. F.o.b. sales do not comprise the majority of sales year-round and are likely to be relatively low during summer when the supply of limes exceeds the demand.

21. Limeco charges a 10% commission on the f.o.b. sales it makes.

22. Limeco does not collect a commission for itself on sales made by consignment houses at receiving or terminal markets. The pool is charged the consignment seller's commission (up to 20%) plus terminal charges and freight. The result is a lower net return to the pool than if the product had been sold f.o.b. by Limeco.

23. Limeco charges its pool growers packing charges on all sales of packed produce (i.e., f.o.b. sales and sales at consignment houses). Limeco charged packing charges of $1.35 per pony box and $3.00 per bruce box during the relevant time period.

24. Limeco does not charge commissions on sales of unpacked produce (juice limes).

25. Limeco collects fees to pay for the required government inspections and assessments for the Florida Lime and Avocado Committee. Inspection fees and assessments to the Florida Lime and Avocado Committee in the total amount of $0.36 per bushel were charged on all sales of packed limes during the relevant time period.

26. In July 1988, Combined and Limeco agreed that Limeco was to remit to Combined all proceeds of sale of Combined's marketable fruit less commissions, assessments and fixed packing charges.

27. Limeco pooled Combined's fruit with that of other growers.

28. Limeco pools all limes it handles for growers during any calendar week. A record of the quantity and grade of fruit from each grower is made on receipt. Fruit that cannot be packed as U.S. combination grade is culled out and the remainder of the grower's fruit is combined for sales purposes with all other fruit of a like kind. Sales proceeds from a particular pool are combined and, after the deduction by Limeco of its commission and fixed packing charges and assessments, are divided pro rata among those growers whose limes went into the pool.

29. Limeco has never pooled limes by size nor accounted to its growers by any particular size of lime.

30. Neil Brooks of J.R. Brooks & Son, Inc., the largest Florida lime producer and handler, testified regarding customs in the lime industry. It is custom in the industry to pool limes for sales.

31. Limeco has never paid growers according to the size of limes. J.R. Brooks & Son began pooling by size and paying growers according to size of limes only recently; however, Brooks accounts by size during only part of the year.

32. No government regulation or industry custom requires handlers to account and pay for limes by size.

33. Yamamura explains the details of Limeco's handling of limes and Limeco's charges to each new grower who comes to Limeco. Yamamura explained to Planes how Limeco would handle Combined's produce. Yamamura never told Planes that Limeco would pay different prices based on the size of limes.

34. Prior to the beginning of Combined and Limeco's business relationship, Yamamura explained to Planes what Limeco's packaging charges were ($1.35 per pony box and $3.00 per bruce box), how the pools were operated, when the pool payments were made, the amount of Limeco's sales commission (10%) and the amount of fees and assessments ($0.36 per bushel).

35. Combined and Limeco orally agreed that beginning in July 1988, Combined would deliver to Limeco limes and mangoes to be graded, packed, sold, and shipped by Limeco. The parties further agreed that Limeco would use a weekly pool system of selling and accounting. Limeco agreed to remit to Combined five weeks after the close of each pool Combined's pro rata share of the net proceeds of sale of the pool produce, less standard packing charges, commissions, inspection fees and assessments.

36. Limeco paid Combined a share of the pool proceeds, exclusive of Limeco's commission, packing charges, and assessments.

37. Combined received regular pool payments and grower's payable reports by individual grove during the time the parties did business from July 1988 through July 1990.

38. Combined agreed that its limes would be pooled and that it would accept its share of the pool return.

39. Planes testified that he thought Combined's fruit was pooled by size. The court finds as a fact, however, that Planes knew Combined's limes were being pooled for sale generally, and not according to size. The court makes this credibility assessment based on Planes' knowledge of the practices in the lime growing industry as well as the other credibility factors discussed herein.[1]

40. Planes is an intelligent man who possesses a bachelor's degree in accounting and previously worked as a certified public accountant.

41. Planes knew little about growing fruit when he first got into the grove business, but he quickly became very educated about the lime industry. Planes studied up on the lime growing business and familiarized himself with the methods in the industry when he began his lime growing venture. Even the defendant's witnesses agreed that Planes is intelligent and a quick learner.

42. The court finds it incredible that Planes could not know that Combined's limes were being pooled generally and that the proceeds Combined received represented its pro rata share of the net pool return, especially since these practices were the custom in the industry.

43. Planes could not have believed that his limes were pooled, sold, and accounted for by size, since each lot Combined brought to Limeco during any pool week received the exact same rate of return per bushel. If payment differed according to size, the rate of return by lot would be expected to differ based on the mix of sizes within each lot. None of the paperwork Planes received from Limeco during the two year period of time indicated that his limes were being pooled by size.

44. Based on all the evidence presented at trial, Planes must have known that Combined's limes were being pooled generally rather than being pooled by size. There was testimony that this was standard practice in the industry. Several longstanding

1. While the court did not rely specifically on this matter in determining Planes' credibility, the court notes that Planes was convicted in the United States District Court for the Southern District of Florida of a felony offense involving misapplication of funds. Planes served time in prison and was on parole at the time of the trial. As a result of his conviction, Planes is now barred from his previous occupation as a certified public accountant.

customers of Limeco testified that they understood the practice to be that all limes were pooled regardless of size. These witnesses all knew how their limes were processed, since this had been explained to them at the beginning of their relationship with Limeco. Further, the testimony indicated that the price of limes differed little based on size. J.R. Brooks & Son is apparently the only lime packer who pools limes by size and this is a relatively new practice for Brooks.

45. As an addition credibility factor, there appears to have been a motivational factor involved in the filing of this action. Planes owed Yamamura a sum of money (approximately $17,500) from Planes' purchase of some trees from Limeco. Shortly after the note came due in September 1990, Planes countered that additional sums were owed Combined from Limeco for Combined's limes.

46. Further, Planes claims that from the beginning of the relationship between Combined and Limeco, he believed that the price he received and his packout percentage were unfair. Planes made no formal complaints, however, until after the parties had ceased their two year long business relationship.

47. Limeco did not enter into a written contract with Combined or any other lime growers at any time relevant to this lawsuit.

48. Limeco did not deliver to Combined a written statement describing the terms and conditions under which it would handle Combined's produce for the 1988–89 and 1989–90 seasons.

49. There was no agreement, written or oral, between Combined and Limeco to sell Combined's limes at any particular price. Specifically, there was no agreement that Limeco would match the prices reported in the *Federal/State Market News*. *Federal/State Market News* prices reflect asking prices or starting prices, and do not accurately reflect the price obtained for f.o.b. sales. Limeco must adjust its asking price to meet competition, specifically, the price quoted by J.R. Brooks & Son.

50. Prior to the time Combined filed this action, it was industry custom that agreements between Florida lime growers and packing houses were informal and oral.

51. J.R. Brooks & Son did not enter into written agreements with its growers regarding the handling of fruit during the time period relevant to this lawsuit. Neil Brooks testified that based on the present lawsuit filed by Combined, J.R. Brooks & Son now enters into written agreements with its growers.

52. While Planes was employed as President of Southeast Grove Management from August 1987 to July 1988, Southeast Grove Management did not enter into written contracts with lime growers or provide written statements of terms to lime growers.

53. When Planes took his limes to J.R. Brooks & Son during the same general time frame, Brooks did not provide Planes with a written contract or written statement of terms.

54. Limeco never obtained dump certificates for the times it was forced to dump excess limes.

55. J.R. Brooks & Son has never obtained a dump certificate before dumping limes that cannot be marketed.

56. Limeco paid Combined all sums to which Combined was entitled based on Combined's lime deliveries. Limeco paid Combined its proper pro rata share of the pool proceeds after deducting the appropriate commissions, packing charges and assessments.

57. The court finds no irregularities or discrepancies in Limeco's accounting for the inventory it handled for pool growers in general, and Combined in particular.

58. Limeco accounted for all limes delivered to it by Combined during the relevant time periods. Combined failed to present any credible evidence that Limeco engaged in any "skimming" of limes or converting pool inventory to its own account between 1988 and 1990. There were no "missing" limes or "hidden" sales by Limeco. In this regard, the court found the testimony of Yamamura and Limeco's bookkeeper Eliza-

beth Harrill very credible. Limeco's methods appear to be consistent with industry practice.

59. During its many years in the business, Limeco has never had any complaints filed against it with the United States Department of Agriculture or any other governmental agency regarding the conduct of its business. Unlike other handlers such as J.R. Brooks & Son, Limeco has never had a complaint about shipments arriving at destination short weight. Limeco enjoys a good reputation in the Florida lime industry.

60. Plaintiff's two expert accountants did not enter into the case until just before the trial of this matter. Both experts based their opinions on incomplete information. The experts did not consult documentation readily available from Limeco which would have accounted for the allegedly missing fruit. The court found the experts' analysis flawed and worthy of no weight whatsoever.

61. Plaintiff's accountant Huston testified by deposition dated February 10, 1992. Huston's conclusions were hurriedly reached, since he was retained only weeks before the trial and was deposed only days before trial. Huston testified from draft and admittedly incomplete reports. The court gleaned no helpful information from Huston's deposition.

62. Plaintiff's other accountant Stelling testified at trial. Stelling based his conclusions on incomplete information. Stelling's testimony was sullied seriously on cross-examination when Stelling was able to locate "missing" invoices by reference to Limeco's pool books. Stelling's conclusions were also hurriedly reached, since he had been retained even later than Huston.

63. Combined's theories of recovery and damages did not surface until a few days before trial.

64. Combined presented no evidence that it was damaged by defendant's method of pooling limes.

65. Combined has failed to show that it was damaged in any way as a result of any of Limeco's conduct.

66. Plaintiff presented no credible evidence as to damages regarding any transactions in mangoes or avocados.

## CONCLUSIONS OF LAW

1. This action arises under the Perishable Agricultural Commodities Act, 7 U.S.C. § 499a et seq. ("PACA"). PACA provides in pertinent part:

It shall be unlawful in or in connection with any transaction in interstate or foreign commerce—

. . . .

(4) For any commission merchant, dealer, or broker . . . to fail or refuse truly and correctly to account and make full payment promptly in respect of any transaction in any such commodity to the person with whom such transaction is had; . . . .

7 U.S.C. § 499b(4).

2. PACA provides the following remedies:

(a) If any commission merchant, dealer, or broker violates any provision of section 2 [7 U.S.C. § 499b] he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation.

(b) Such liability may be enforced either (1) by complaint to the Secretary [of Agriculture] as hereinafter provided, or (2) by suit in any court of competent jurisdiction; . . .

7 U.S.C. § 499e(a)-(b).

3. The court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337.

4. The court has personal jurisdiction over the parties.

5. Venue is proper in this District. 28 U.S.C. § 1391(b).

6. Combined's deliveries of limes to Limeco and Limeco's disposition of these deliveries were in interstate commerce within the meaning of PACA. 7 U.S.C. § 499a(b)(3) and (8).

7. As discussed below, Limeco is a dealer, a handler/shipper, and a growers' agent within the meaning of PACA and the regu-

lations promulgated thereunder. Limeco is not a broker, a commission merchant, a receiving market commission merchant, or a market receiver as those terms are defined or used in PACA and the regulations.

8. Limeco is a dealer in perishable agricultural commodities as those terms are defined by 7 U.S.C. § 499a(b)(4) and (6). A dealer is defined in relevant part as "any person engaged in the business of buying or selling in wholesale or jobbing quantities, as defined by the Secretary, any perishable agricultural commodity in interstate or foreign commerce, ..." *Id.* § 499a(b)(6). Likewise, Limeco meets the definition of dealer in the regulations promulgated under PACA, 7 C.F.R. § 46.2(m) (" 'Dealer' means any person engaged in the business of buying or selling in wholesale or jobbing quantities in commerce and included: (1) Jobbers, distributors and other wholesalers; ... (3) Growers who market produce grown by others.").

9. The PACA regulations define a shipper as "any person operating at shipping point who is engaged in the business of purchasing produce from growers or others and distributing such produce in commerce by resale or other methods, ..." 7 C.F.R. § 46.2(*o*).

10. A handler is defined by the Florida lime regulations as synonymous with shipper and means "any person (except a common or contract carrier transporting limes owned by another person) who handles limes or causes limes to be handled." 7 C.F.R. § 911.9. "Handle" is defined in the regulations as synonymous with "ship" and means "to sell consign, deliver, or transport limes within the production area or between the production area and any point outside thereof ..." 7 C.F.R. § 911.10. Limeco acted as a handler of Combined's limes at all relevant times.

■ 11. Limeco is licensed under PACA as a handler of fruits and vegetables and a wholesaler. Limeco is not licensed as a commission merchant or broker. The court finds this license to be very persuasive (if not conclusive) evidence as to Limeco's status under the PACA and the regulations. Further, there was no evidence that Limeco

was acting in some other capacity, such as a market receiver, broker, joint account partner, or receiving market commission merchant with respect to Combined. The regulations applicable to those categories of persons (7 C.F.R. §§ 46.18–.23, .27–.28, .29) are therefore not applicable to Limeco.

12. A commission merchant is defined in PACA as "any person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another." 7 U.S.C. § 499a(b)(5). Limeco never acted as a commission merchant in its dealings with Combined.

13. A broker is defined as "any person engaged in the business of negotiating sales and purchases of any perishable agricultural commodity in interstate or foreign commerce for or on behalf of the vendor or the purchaser, respectively, ..." 7 U.S.C. § 499a(b)(7). Limeco is not a broker within the meaning of 7 U.S.C. § 499a(b)(7).

14. The regulations define receiving market commission merchant as "any person operating on a receiving market who is engaged in the business of receiving produce in commerce for sale, on commission, for or on behalf of another." 7 C.F.R. § 46.2(r). Limeco does not operate on a receiving market in the business of receiving produce for sale on commission. Limeco is thus not a receiving market commission merchant.

15. The regulation defining the duties of a receiving market commission merchant, 7 C.F.R. § 46.29, does not apply to Limeco. The prohibition against pooling of sales without written permission which is found in 7 C.F.R. § 46.29(a) is applicable only to receiving market commission merchants and joint account partners. Limeco is neither a receiving market commission merchant nor a joint account partner. Further, the prohibition in section 46.29 against pooling of sales absent specific written permission of the consignor does not contemplate the type of grower pooling as practiced by Limeco, J.R. Brooks & Son, and other handlers who are not operating in a receiving market.

16. The regulations governing market receivers impose a requirement that the receiver account for all dumped produce. 7 C.F.R. § 46.22. The regulation further requires a dump certificate when five percent or more of a shipment is dumped. *Id.* A dump certificate is required only for market receivers. *See generally* 7 C.F.R. §§ 46.18–.23. Because Limeco did not act as a market receiver as that term is used in the regulations, Limeco is not subject to the dump certificate requirement. This regulation does not contemplate the culling and discarding of a grower's unmarketable produce by Limeco at Limeco's packing house immediately prior to grading and packing.

17. The regulation at 7 C.F.R. § 46.23 provides further support that the dump certificate requirement does not apply to Limeco. Section 46.23 requires the dump certificate to "identify the produce by showing the commodity, lot number, brand or principal identifying marks on the containers, quantity dumped, name and address of shipper, name and address of applicant, condition of the produce, time, place, and date of inspection and a statement that the produce possesses no commercial value." 7 C.F.R. § 46.23. Limeco receives unpacked fruit in bin boxes straight from the groves. The produce Limeco receives comes with no identifying lot numbers, identifying marks or brand names on the containers, and does not arrive by way of a shipper. The regulation contemplates that a dump certificate must be obtained for fruit that has been packed and shipped and which must be dumped at its ultimate destination many miles away from the grower. The regulation does not contemplate the need for a federal inspector to inspect field run fruit at the local packing house before the handler may remove the culls. The grower—who has just delivered his fruit to the packing house—does not need the protection of a federal inspection. The grower may simply observe his fruit being run through the packing line to determine the extent of his packout and, likewise, the amount of culls which must be dumped.

18. The regulations define a growers' agent as "any person operating at shipping point who sells or distributes produce in commerce for or on behalf of growers or others and whose operations may include the planting, harvesting, grading, packing, and furnishing containers, supplies, or other services." 7 C.F.R. § 46.2(q). Limeco acted as a grower's agent within the meaning of the regulation when handling Combined's pooled produce.

19. Limeco is subject to 7 C.F.R. § 46.-30, which defines the types of operations by growers' agents and shippers:

(b) Growers' agents sell and distribute produce for or on behalf of growers and others and, in addition, may perform a wide variety of services, such as financing, planting, harvesting, grading, packing, furnishing labor, seed, containers, and other supplies or services. They usually distribute the produce in their own names and collect payment direct from the consignees. They render accounting to their principals, paying the net proceeds after deducting their expenses and fees. Some agents are limited by contract to making only sales and cannot joint or consign produce without obtaining the prior consent of the growers. Other agents are granted blanket authority by the growers to market and distribute the produce, using their discretion as to the best methods, depending on market conditions and the quality of the produce available. ... *Some agents have an agreement with the growers to pool the produce and render accountings on the basis of the average or prorated selling prices after deducting the prorated expenses incurred for the various operations performed and the agents' selling fees. ... Some agents's contracts specify a fixed charge for harvesting, grading, packing, furnishing the container or other services, plus a selling fee, and thereby substantially reduce the record requirements necessary to prove the costs of various operations.*

7 C.F.R. § 46.30(b) (emphasis added).

20. Under section 46.30 of the regulations, growers' agents may possess consid-

erable discretion to pool and market produce and to handle accounts. Limeco had such authority given to it by Combined. Limeco acted as grower's agent for Combined, possessed full authority to market Combined's produce, and was authorized by the regulations and industry custom to maintain fewer records.

21. The regulations further define the duties of growers' agents as follows:

(a) *General.* The duties, responsibilities, and extent of the authority of a growers' agent depend on the type of contract made with the growers. Agreements between growers and agents *should* be reduced to a written contract clearly defining the duties and responsibilities of both parties and the extent of the agent's authority in distributing the produce. *When such agreements between the parties are not reduced to written contracts, the agent shall have available a written statement describing the terms and conditions under which he will handle the produce of the grower during the current season and shall mail or deliver this statement to the grower on or before receipt of the first lot.* A grower will be considered to have agreed to those terms if, after receiving such statement, he delivers his produce to the agent for handling in the usual manner. ... A copy of this statement, showing the name of the grower and the date the statement was delivered to the grower, shall be retained in the agent's files. *An agent who does not have in his files either written contracts or a written statement as required herein is failing to prepare and maintain full and complete records as required by the Act. ... An agent who fails to perform any specification or duty, express or implied, is in violation of the Act and may be held liable for any damages resulting therefrom* and for other penalties provided under the Act for such failure.

(b) *Accounting for charges.* A growers' agent whose operations include such services as the planting, harvesting, grading, packing, furnishing of containers or other supplies, storing, selling or distributing produce for or on behalf of growers shall prepare and maintain complete records on all transactions in sufficient detail as to be readily understood and audited. Agents must be in a position to render to the growers accurate and detailed accountings covering all aspects of their handling of the produce. Agents shall maintain a record of all produce received in the form of a book (preferably a bound book) with numbered pages or comparable business records, showing for each lot the date received, quantity, the kind of produce and the name and address of the grower. Agents shall issue receipts to growers and others for all produce received. A lot number or other positive means of identification shall be assigned to each lot in order the segregate the various lots of produce received from different growers from similar produce being handled at the same time. Each lot shall be so identified and segregated throughout all operations conducted by the agent, including the sale or other disposition of the produce. The records shall show the result of all packing and grading operations, including the quantity lost through packing and grading and the quantity and quality packed out. If the culls are sold, they shall be included in the accounting. *Unless there is a specific agreement with the growers to pool all various growers' produce, the accounting to each of the growers shall itemize the actual expenses incurred for the various operations conducted by the agent* and all the details of the disposition of the produce received from each grower including all sales, adjustments, rejections, details of consigned or jointed shipments and sales through brokers, auctions, and status of all claims filed with or collected from the carriers. The agent shall prepare and maintain full and complete records on all details of such distribution to provide supporting evidence for the accounting. *If an agent is working under a pool agreement with growers, the accounting shall show how the pool cost and pool sales prices are*

*computed. If the agent and the growers have agreed on a fixed charge to cover the various operations conducted by the agent, actual expenses incurred for these services covered by the agreement are not required to be shown in the accounting. The failure of the agent to render prompt, accurate and detailed accountings in accordance with § 46.2(z) and (aa), is a violation of the Act.*

7 C.F.R. § 46.32 (emphasis added).

[3] 22. Limeco's accounting practices conform to the requirements of section 46.-32(b). Because Limeco pools limes, it is not required to itemize actual expenses for the disposition of produce received.

[4] 23. The court has no authority to impose penalties for PACA violations. The Secretary of Agriculture has the authority to impose penalties for PACA violations. *E.g.,* 7 U.S.C. § 499c(a) (monetary penalty for failure to obtain license); *id.* §§ 499g, 499h, 499i, 499m (authorizing Secretary to suspend or revoke license for various violations of PACA or of the Secretary's orders).

[5] 24. PACA does not provide for an automatic award of damages for violation of the Act or the regulations promulgated thereunder. PACA provides that if any dealer violates any provision of 7 U.S.C. § 499b, "he shall be liable to the person or persons injured thereby for the full amount of damages sustained in consequence of such violation." 7 U.S.C. § 499e(a).

[6] 25. Limeco violated 7 C.F.R. § 46.-32(a) by its failure to comply with the requirement that it either enter into written agreements with its growers or provide its growers a written statement of terms and conditions under which it would handle growers' limes. Pursuant to the regulations, a growers' agent who fails to comply with this requirement "is in violation of the Act and may be held liable for any *damages resulting therefrom* and for other penalties provided under the Act for such failure." 7 C.F.R. § 46.32(a) (emphasis added).

[7] 26. Combined suffered no harm from Limeco's failure to provide a written contract or statement of terms. Combined was not damaged by this minor omission, since Planes was aware of the terms of the contract and agreed to them. Planes knew his limes were being pooled generically, and not by size. Planes knew how the grading and culling was done. Planes was aware of and agreed to the packing charges and commissions charged by Limeco for f.o.b. sales. Limeco's failure to provide a written document was consistent with Florida industry custom.

27. Limeco's practices are in compliance with the accounting regulations. No irregularities appear in the books. Limeco maintained all accounting records it was required to maintain and provided the accounting required for pooled produce. Because it pools limes, Limeco is not required to itemize its actual expenses and all details of the disposition of the produce it handles. 7 C.F.R. § 46.32(b).

28. Limeco provided Combined with an adequate accounting. Limeco accounted for and paid for all limes delivered to it by Combined. Combined received all sums to which it was entitled.

29. Assuming Limeco has violated some of the minutiae of the regulations with regard to accounting, Combined has not demonstrated any harm resulting therefrom. The accounting that was rendered was adequate.

30. Assuming there have been one or more violations of the Act and/or the regulations promulgated thereunder, they were technical in nature. Assuming one or more violations of PACA by Limeco, Combined has failed to show by a preponderance of the evidence that it sustained any damages in consequence of those violations.

IT IS BY THE COURT THEREFORE ORDERED that judgment be entered in favor of defendant. Costs shall be taxed against plaintiff.