[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 16-14431

_____

D.C. Docket No. 5:13-cv-00386-WTH-PRL


S & S PACKING, INC.,

Plaintiff-Appellant,

versus

SPRING LAKE RATITE RANCH, INC.,
d.b.a. Spring Lake Blueberry Farm,

Defendant-Appellee.


_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(July 19, 2017)

Before WILSON and ANDERSON, Circuit Judges, and ROTHSTEIN,* District
Judge.

ANDERSON, Circuit Judge:


_____

*    Honorable Barbara J. Rothstein, United States District Judge for the Western District of
Washington, sitting by designation.

This case arises from a contractual dispute between a blueberry farm and its agent. The district court upheld a USDA judicial officer's damages award against the agent in favor of the farm. We reverse the district court's decision in part, affirm in part, and remand for further proceedings.

## I.    BACKGROUND

Spring Lake Ratite Ranch, Inc., d.b.a. Spring Lake Blueberry Farm ("Spring Lake") is a grower of blueberries in Brooksville, Florida.[1] It is owned by Ruth and Larry Davis. Spring Lake contracted with S & S Packing, Inc. ("S&S") to pack and market Spring Lake's 2010 blueberry crop. S&S is owned and operated by Sam Mills ("Mills"). In 2010, S&S also packed and marketed blueberries from several other local farms, including two owned by Mills. S&S packed growers' berries into any one of three different sizes of container — 4.4-oz. containers, 6-oz. containers, or pint containers. S&S then packed containers of the same size into "flats" for shipping.[2] S&S sold these blueberries almost exclusively through Sun Belle Inc. ("SunBelle"), a third-party marketer. S&S operated a "pooling"

---

[1]    For the curious, "ratite" refers to a group of flightless birds including the ostriches that Spring Lake farmed before moving into the blueberry business.

[2]    We follow the parties in referring to individual packs of berries — of the type you would buy in a store — as "containers." The parties refer to batches of these containers variously as "flats," "units," "cases," and "cartons." For simplicity we refer to a group of containers packed together as a "flat" throughout.

arrangement, under which it aggregated the money it received from SunBelle for all berries in each pool week and apportioned it among the growers.

Spring Lake was unhappy with S&S's performance with regard to its 2010 crop and filed a formal complaint with the Secretary of Agriculture pursuant to the Perishable Agricultural Commodities Act ("PACA"), 7 U.S.C. § 499a et seq. (2012). The complaint made numerous allegations, including: (1) S&S had calculated packing charges on a per-pound rather than a per-flat basis in violation of the contract;[3] (2) S&S had improperly charged Spring Lake with two commissions — its own and SunBelle's — in violation of PACA regulations; and (3) S&S's method of calculating the "pool price" (that is, apportioning net receipts) led to disparities in the rates per pound that different growers received.[4] Spring Lake claimed $109,295.65 in damages on the basis of these violations. Spring Lake also alleged that S&S had failed to invoice SunBelle as required by regulations and that its records were poorly maintained, but did not allege any damages stemming from these deficiencies.

---

[3]    No tribunal has ruled on this claim, although the USDA judicial officer implicitly rejected it by calculating packing charges on a per-pound basis.

[4]    Additionally, Spring Lake alleged that S&S had miscalculated payments for some berries by allotting them to the wrong pool period; had improperly subtracted "pooled losses" from payments to Spring Lake; and had not helped it in arranging labor or obtaining certification.

3

The USDA judicial officer concluded that S&S had failed to invoice SunBelle as required by its contract and to comply with various recordkeeping requirements of the applicable regulations. Specifically, the judicial officer concluded that S&S's records were too unreliable to support an audit in violation of 7 C.F.R. § 46.14 (2017); that it had failed to produce sales tickets bearing sequential serial numbers in violation of 7 C.F.R. § 46.19; and that its treatment of "pooled losses" failed to comply with the requirements of 7 C.F.R. § 46.32. The judicial officer did not address any of Spring Lake's other claims.

The judicial officer then calculated Spring Lake's damages. He held that deficiencies in S&S's recordkeeping made S&S's figures unreliable. Consequently, instead of using the actual sales prices received by S&S, the judicial officer used the reports of market prices published by the USDA Market News service ("Market News") to calculate the amount that Spring Lake should have received for its blueberries and subtracted S&S's documented costs. Because this produced a figure far in excess of Spring Lake's claimed damages, the judicial officer capped the damages at the amount Spring Lake had claimed, plus interest and fees.

S&S posted the appropriate bond and brought suit in the district court for the Middle District of Florida to obtain review of the judicial officer's decision under PACA. A disappointed party in a PACA proceeding may have a "trial de novo" in

4

a district court, with the exception that "the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated." 7 U.S.C. § 499g(c). S&S submitted additional documentation, including, most importantly, SunBelle's records of all blueberries delivered to it by S&S. The district court affirmed the judicial officer's decision, holding that S&S had not rebutted the judicial officer's findings, that the judicial officer acted within his authority in relying on Market News prices, and that S&S had acted improperly in charging Spring Lake with two commissions.[5] The district court did not rule on the remainder of Spring Lake's claims.

S&S timely appealed.

## II.    DISCUSSION

The district court had subject-matter jurisdiction over this case under 7 U.S.C. § 499g(c). We have appellate jurisdiction under 28 U.S.C. § 1291 (2012).

We review a district court's findings of fact for clear error and conclusions of law de novo. Garcia-Celestino v. Ruiz Harvesting, Inc., 843 F.3d 1276, 1284

---

[5]    Before the district court, S&S did not dispute that it should not have charged Spring Lake for the "pooled losses" in the amount of $2,889.36. Additionally, it initially stipulated before the district court that it owed a further $10,361.75 to Spring Lake because of an error in calculating Spring Lake's payment for pool week 16, but later indicated that the proper amount should have been $3,942.54 instead. S&S also conceded below that it had assigned some shipments to the wrong pool period (weeks 19–20 instead of week 18), but argued that the error had not caused Spring Lake any damages.

5

n.4 (11th Cir. 2016) (citing Tartell v. S. Fla. Sinus & Allergy Ctr., 790 F.3d 1253, 1257 (11th Cir. 2015)).

## A. The Contract's Requirements with Regard to Pooling

In affirming the judicial officer's decision, the district court relied in part on its determination that the contract required berries to be traceable from the grower through to SunBelle — i.e., that S&S be able to show what SunBelle paid for each particular flat of Spring Lake's blueberries. We reject this interpretation.

The district court determined that the judicial officer's use of market prices was justified in part because the contract required S&S to produce records demonstrating what SunBelle paid for Spring Lake's berries specifically. We reject this interpretation of the pooling arrangement because it is supported neither by the contract nor by USDA regulations.

PACA has some substantive requirements, but it does not constitute a complete body of law. Accordingly, when PACA is silent on a matter, state law provides the rule of decision. Rothenberg v. H. Rothstein & Sons, 183 F.2d 524, 526 (3d Cir. 1950); see also Bocchi Americas Assocs. Inc. v. Commerce Fresh

6

Mktg. Inc., 515 F.3d 383, 391 (5th Cir. 2008) (applying state statute of frauds in PACA case).[6]

Florida courts enforce contracts according to their plain terms when those terms are unambiguous. Arriaga v. Fla. Pac. Farms, L.L.C., 305 F.3d 1228, 1247 (11th Cir. 2002). Under Florida law, a court "must construe a contract in a manner that accords with reason and probability and avoid an absurd construction." Siegel v. Whitaker, 946 So. 2d 1079, 1083 (Fla. 4th DCA 2006) (citing Kipp v. Kipp, 844 So. 2d 691, 693 (Fla. 4th DCA 2003)). Courts should construe terms "to promote a reasonable, practical and sensible interpretation consistent with the intent of the parties." Id. at 1083–84 (citing U.S. Fire Ins. Co. v. Pruess, 394 So. 2d 468, 470 (Fla. 4th DCA 1981)).

The contract has this to say about pooling: "The sales price shall be determined by an average of ALL fruit sold in the week delivered. This shall be known as the POOL PERIOD and the starting and ending of each POOL PERIOD shall be determined by S&S before the 2010 harvest begins."

---

[6] We have on at least one occasion applied general principles of law to a PACA case. See C.H. Robinson Co. v. Trust Co. Bank, N.A., 952 F.2d 1311, 1313 (11th Cir. 1992) (applying "general trust principles"). C.H. Robinson is distinguishable because it concerned PACA's statutory trust provisions (a matter of federal law) rather than a contract dispute (which is typically a matter of state law). Regardless, we have seen nothing to suggest that the result we reach would be any different under general principles of contract law.

7

Nowhere in this language can we discern any requirement that Spring Lake trace the journey of a particular grower's berries through to their final sale.  And to require S&S to do so would defy common sense: a "traceability" requirement would have no effect on the price ultimately paid to growers, because the contract clearly allows S&S to apportion receipts among the growers based on their deliveries to S&S during the week in question.[7]  But the burden to all parties would be significant.  S&S would be required to expend significant resources tracking otherwise irrelevant data.  This would undo in large part the main efficiency of a pooling system, which is to allow the grower's agent to combine like produce.  We refuse to interpret the contract to require S&S to be able to trace the produce of particular growers through to its ultimate sale.

Nothing in the applicable regulations overrides our interpretation of the contract.  Under 7 C.F.R. § 46.32(b), a grower's agent is required to provide "all the details of the disposition of the produce received from each grower," "[u]nless there is a specific agreement with the growers to pool all various growers' produce."  Here, the parties do not dispute that there was a pooling arrangement in place, so the regulations do not tell us what details S&S was required to provide. In fact, the regulations reinforce our interpretation of the contract: the fact that they

---

[7]    For the same reason, Spring Lake would have suffered no damages on account of any violation of such a provision.

explicitly require a detailed statement of the disposition of each grower's berries <u>unless</u> there is a pooling agreement suggests that the regulation's drafters did not think that such a statement was necessary when a pooling agreement was in place.

## B. Damages Based on Inadequacies in S&S's Records

The district court affirmed the judicial officer's grant of damages to Spring Lake based in large part upon inadequacies in S&S's recordkeeping and invoices.[8] This was error.  The award was not authorized under PACA because Spring Lake adduced no evidence, either before the judicial officer or the district court, that these inadequacies caused its injuries.

Under PACA, an entity may be liable for failing to maintain proper accounts.  <u>See</u> 7 U.S.C. § 499b(4).  Such liability is limited to "the full amount of damages . . . sustained <u>in consequence</u> of such violation."  <u>Id.</u> § 499e(a) (emphasis added).  That is, PACA does not impose punitive sanctions for sloppy bookkeeping; it has the familiar requirement that the violation must have caused the injury for which the claimant is to be compensated.  <u>See</u> <u>Combined Prof'l Res., Inc. v. Limeco, Inc.</u>, 801 F. Supp. 664, 673 (S.D. Fla. 1992) ("PACA does not provide for an automatic award of damages for violation of the Act or the regulations promulgated thereunder.").

---

[8]     S&S contests whether it actually violated PACA's recordkeeping requirements.  Here, we can assume for the sake of argument that there were some such violations.

9

Here, Spring Lake did not allege that S&S's deficient recordkeeping caused it to suffer any damages. Nor did the judicial officer or district court make such a finding. And the record would not support a finding that the recordkeeping deficiencies to which the judicial officer and the district court pointed caused damages that would justify the judicial officer's award.[9] The judicial officer erred in awarding damages on this basis, and the district court should not have upheld his decision on this ground.

## C. The Use of USDA Market News Prices to Calculate Damages

It is clear from immediately preceding Part B, both from the evidence and as a matter of common sense, that the deficiencies in the records to which the judicial officer and the district court pointed did not cause damages which would justify the judicial officer's damages award. The judicial officer concluded that the records were so deficient that they were not a reliable indication of appropriate prices, and that therefore resort to the Market News prices was warranted. For the reasons set forth below, we hold that the district court erred in upholding this aspect of the judicial officer's decision. In the situation presented here, where the parties agreed upon a contract price, a legitimate sale occurred, and the agreed price is reasonably

---

[9] For example, it is a matter of common sense that neither the failure to consecutively number the relevant records nor the erroneous charging of $2,889.36 in "pooled losses" to Spring Lake in weeks 17, 18, and 19 could have caused the damages awarded by the judicial officer.

10

ascertainable from the records, it is not appropriate to look to market data to determine price and calculate damages.

We first examine when it is appropriate to use market data as a measure of damages. Under Florida contract law, expectation damages are the favored remedy for a breach of contract — that is, courts seek to place the injured party in the position that she expected had she had the benefit of her bargain.[10] See Katz Deli of Aventura, Inc. v. Waterways Plaza, LLC, 183 So. 3d 374, 379 (Fla. 3d DCA 2013); Lindon v. Dalton Hotel Corp., 49 So. 3d 299, 305 (Fla. 5th DCA 2010). The injured party is not "entitled to be placed, because of [a] breach, in a position better than that which he would have occupied had the contract been performed."

---

[10]    The judicial officer and district court both cited to chapter 2 of the Uniform Commercial Code ("UCC chapter 2"). We doubt that Florida's version of UCC chapter 2, Fla. Stat. § 672 (2016), applies to this case because this was a contract for S&S's packing and marketing services rather than a contract for goods. See id. § 672.102. However, we need not decide this question because we would reach the same result if UCC chapter 2 applied.

The statute makes clear that the primary situation for using market data to supply a price is when a sale is not consummated. See Fla. Stat. § 672.723(1) (setting the appropriate time for calculating damages based on market prices in anticipatory repudiation cases); id. § 672.708 (specifying that a seller's damages are calculated with respect to the prevailing market price in cases where the buyer has anticipatorily repudiated the contract or refused delivery); id. § 672.713 (specifying that a buyer's damages are calculated with respect to the prevailing market price in cases of anticipatory repudiation, nondelivery, rejection after arrival, and revocation of acceptance); see also id. § 672.305(1)(c) (stating that parties can agree to be bound by a prevailing market price). Neither Spring Lake, nor the district court, nor the judicial officer has pointed to any statutory provision, or any other authority, that allows the use of market price data when the price that the parties agreed upon for a sale that actually occurred is reasonably ascertainable.

11

Lindon, 49 So. 3d at 305 (quoting Madison Fund, Inc. v. Charter Co., 427 F. Supp. 597, 608 (S.D.N.Y. 1977)).

With regard to the record required to support an award of damages, it need only support a damages calculation with "reasonable certainty," not "mathematical precision." W. Boca Med. Ctr. v. Marzigliano, 965 So. 2d 240, 244 (Fla. 3d DCA 2007). However, an award may not be sustained on the basis of "speculation or guesswork," even if the defendant by its own wrong made damages incalculable. Lindon, 49 So. 3d at 307.

It is clear under Florida law that where the parties have freely agreed on a contract price, the sale takes place, and the price agreed upon by the parties is ascertainable to a reasonable degree of certainty, it is impermissible to resort to market data — for to do so would be to deny the parties the benefit of their bargain. Of course, the sales price must be that actually contracted for by the parties. If one party breaks a contractual requirement that the price be set in good faith, then the use of market data may be permissible because the actual sales price is not really the price agreed upon in the contract.[11] Similarly, the use of Market

---

[11]    Spring Lake stated in passing in its briefing to the district court and to this Court that S&S had a contractual duty to obtain the best return for its berries, and failed to do so. It did not do so with sufficient clarity to effectively raise the argument that S&S violated such a duty — and Spring Lake has never argued that such a violation would justify the judicial officer's use of Market News prices to calculate damages. By failing to fairly raise this fact-intensive issue in the trial de novo before the district court, Spring Lake waived it. See Hamilton v. Southland

12

News prices might be appropriate in a breach of warranty case to determine the value of the goods as warranted.  See, e.g., Genecco Produce, Inc. v. Sandia Depot, Inc., 386 F. Supp. 2d 165, 172 (W.D.N.Y. 2005) (upholding the Secretary of Agriculture's decision to use Market News reports rather than the invoice price to determine the value of produce as warranted).

The one administrative case cited by Spring Lake and in the decisions below — James Macchiaroli Fruit Co. v. Ben Gatz Co., 38 Agric. Dec. 1477 (U.S.D.A. 1979) — is not to the contrary.  In James Macchiaroli, the judicial officer determined that the contract in question was an "open" contract — that is, a contract where the parties are to agree on a price at a later date and, if they do not, the price is set as "a reasonable price at the time for delivery."  Id. at 1483.  The parties in James Macchiaroli failed to agree on a price and, consequently, it was appropriate for the judicial officer to look to the Market News reports to determine a "reasonable price."  Id.  Indeed, without looking to the Market News prices, it would not have been possible to determine the contract price.  Additionally, James Macchiaroli stands for the uncontroversial proposition that Market News prices are

Christian Sch., Inc., 680 F.3d 1316, 1319 (11th Cir. 2012) (holding that an appellee had waived an argument raised before the district court by not mentioning it in its brief on appeal); see also Sapuppo v. Allstate Floridian Ins. Co., 739 F.3d 678, 682 (11th Cir. 2014) ("Abandonment of issues can occur when passing references appear in the argument section of an opening brief, particularly when the references are mere 'background' to the appellant's main arguments or when they are 'buried' within those arguments.") (citing United States v. Jernigan, 341 F.3d 1273, 1283 n.8 (11th Cir. 2003)).

13

admissible to determine a reasonable price.  See id.  But in the present case, the parties agreed that the price received by Spring Lake would depend on the price obtained by S&S — and never agreed to set a "reasonable price" or to establish the price by reference to Market News.  Neither James Macchiaroli nor any other authority our independent research has uncovered supports the use in this case of any sales price other than the actual sales price that SunBelle and S&S received for the blueberries at issue.

Thus it is not permissible to supplant the actual price paid in a legitimate sale with Market News prices — at least where the actual price paid is reasonably ascertainable.[12]  Because, as we will explain, the price in this case was reasonably ascertainable, the district court erred in upholding the judicial officer's reliance on Market News prices.

Under 7 U.S.C. § 499g(c), the district court's review of the judicial officer's decision "shall be a trial de novo and shall proceed in all respects like other civil suits for damages, except that the findings of fact and order or orders of the Secretary shall be prima-facie evidence of the facts therein stated."  Under this standard, the judicial officer's determination of a fact creates a rebuttable presumption, which can be rebutted with further evidence.  See Frito-Lay, Inc. v.

---

[12]    We express no opinion on the use of market data in cases where the price is not reasonably ascertainable.

14

Willoughby, 863 F.2d 1029, 1033 (D.C. Cir. 1988).  So the hearing officer's determination that S&S's records were inadequate created at most a rebuttable presumption that they were insufficient to determine the actual price paid.

In this case, S&S did introduce further evidence.  Most importantly for our purposes, it introduced all the receipts (or "settlement sheets") that SunBelle sent to S&S for the 2010 growing season.  These documents — the reliability of which was not subject to dispute — clearly make it possible to calculate the actual sales prices received by SunBelle and the extent of any damages that Spring Lake might have suffered.

Specifically, the receipts prepared by SunBelle and sent to Spring Lake tell us the numbers of flats composed of each container size delivered by S&S to SunBelle in each pool period and the price that was paid for them.  There is record evidence as to the average weight of blueberries in flats composed of each different container size.[13]  Thus, both the number of flats and the weight of blueberries delivered by S&S to SunBelle in each pool period are ascertainable, as well as the total price paid for those blueberries per flat or per pound — from which the average price per flat or per pound for each pool period can be determined.  Similarly, from the records reflecting the deliveries by Spring Lake to S&S and

---

[13]    The weights of the flats are subject to some dispute.  But there is ample evidence for the district court to determine the weight of the flats to a reasonable degree of certainty.

15

S&S's payments to Spring Lake, the number of pounds delivered by Spring Lake and the number of flats packed from those berries are reasonably ascertainable, as well as the price per flat or per pound received by Spring Lake.  Accordingly, we conclude that there was no warrant to disregard the actual sales prices of the blueberries, and no warrant to resort to Market News prices.

## D. The Calculation of Pool Prices on a Per-Flat Basis

Spring Lake raises another issue in its brief on appeal — a challenge to S&S's methodology of compensating growers on a per-flat basis rather than a per-pound basis.  The methodology used by S&S in calculating the appropriate amount to pay each of the several growers each pool period was as follows.  S&S pooled all of the blueberries received from the several growers during each pool period, determined the total proceeds received from the sale of those blueberries by SunBelle during that pool period, and calculated the average price per flat received for the sale of the blueberries during that pool period.  S&S's records show the weight of blueberries that Spring Lake delivered to S&S during each pool period, and the number and size of flats packed by Spring Lake from those berries.  S&S paid each grower an amount calculated by multiplying the number of flats packed from that grower's berries during that pool period by the average price per flat received in the sale by SunBelle of those blueberries during that pool period.

16

There were three different kinds of flats: (1) flats made up of 4.4-oz. containers of blueberries; (2) flats made up of 6-oz. containers of blueberries; and (3) flats made up of pint containers of blueberries. Mills testified that the average price per flat that was paid to growers was a weighted average price so that all growers during the pool period shared in the prices received for all the container sizes. Mills testified that the vast majority of the blueberries at issue were in flats of 4.4-oz. or 6-oz. containers.

A flat of 4.4-oz. containers would weigh approximately 3.8 pounds, while a flat made up of 6-oz. containers would weigh approximately 4.8 pounds. Thus, it would take 380 pounds of berries to comprise 100 flats of 4.4-oz. containers, while it would take 480 pounds of berries to comprise 100 flats of 6-oz. containers. Hypothetically, if grower A's berries were packed exclusively in flats of 4.4-oz. containers and grower B's berries were packed exclusively in flats of 6-oz. containers, both growers would receive the same amount for their 100 flats, despite grower A having provided fewer berries by weight. That is, grower B would receive less per pound of berries delivered than grower A. Put another way, it would take more of grower B's berries to fill a given number of flats than grower A's berries. Put still another way, if growers A and B had the same volume of berries by pound, grower B would have fewer flats and be paid less than grower A pursuant to the methodology used by S&S. Thus, although the weighted average

17

price used by S&S meant that all growers during a pool period would share in the prices received for sales of flats made up of all container sizes, the weighted average would not necessarily fully equalize all growers.

Spring Lake argues on appeal that the foregoing methodology was potentially discriminatory, and potentially could have been manipulated by S&S so as to prefer the berries grown by Mills' own farms. While this argument could not justify the use by the judicial officer and the district court of Market News prices in lieu of the actual sales prices paid by SunBelle, the argument could have provided an alternative basis on which Spring Lake might have been able to prove some lesser damages.

We reject Spring Lake's argument.[14] Spring Lake's only argument on appeal is that the methodology could <u>potentially</u> be used to discriminate against a grower. Spring Lake has never pointed to any contractual language requiring that growers be paid on a per-pound basis. The contractual language ("an average of ALL fruit") did not explicitly require S&S to divide the money it received from SunBelle in each pool period on a per-pound basis. In fact, the contract gives S&S significant discretion — there was a delegation to S&S of authority to pack, label,

---

[14]    Our careful review of the record suggests to us that Spring Lake has not preserved this issue. Although the formal complaint before the USDA, which was incorporated into the pleadings in the district court, did articulate the claim, neither the pretrial statement nor Spring Lake's only brief to the district court raised the issue. But we need not decide whether this argument was preserved because Spring Lake loses on its merits.

18

and arrange for shipping, as well as authority to determine the price. In light of the discretion given S&S by the contract, we cannot conclude that the methodology used by S&S violated the contract so long as that method was not discriminatory to the extent that it amounted to an abuse of the discretion which the contract delegated to S&S. However, Spring Lake has pointed to no evidence at all of discrimination. It has suggested only the hypothetical possibility thereof. And our review of the evidence leaves us confident that there has not been discrimination that could rise to the level of a violation of the contract.[15]

In sum, the contract delegates to S&S the functions of "packing, handling, shipping and selling," and specifically authorizes the pooling of all the fruit. Thus, unless the pooling methodology was discriminatory — and we have concluded that there is no evidence that it was — there was no violation of the contract.

Incidentally, this is not a matter about which there was a presumption in favor of Spring Lake. Although 7 U.S.C. § 499g(c) creates a rebuttable presumption of the facts found by the judicial officer, the judicial officer in this case made no finding of fact indicating that the methodology used by S&S was

---

[15]    Spring Lake has wholly failed to prove that there was any manipulation of the methodology. Spring Lake has not proven that S&S treated it differently from, or less favorably than, the other growers. It was SunBelle's orders — not S&S — that determined how many flats of 4.4-oz. and 6-oz. containers were ordered for a given day. Indeed, the only direct testimony was that of Mills to the effect that he adopted and implemented the methodology in order to be sure that all growers were treated the same, and in particular to ensure that there would be no appearance that he was favoring the berries of his own farms.

19

either discriminatory and unfair or was the cause of any loss or damage to Spring Lake.  Thus, in the de novo trial in the district court, like in any other civil suit for damages, Spring Lake would bear the burden of proving this claim for damages.

## E. The Deduction of SunBelle's Commission.

S&S also challenges the district court's holding that it improperly deducted SunBelle's commission from the net sales receipts that it passed on to growers.

This issue is governed by 7 C.F.R. § 46.32(c), which reads:

> Unless a growers' agent is specifically authorized in his contract with the growers to use the services of brokers, commission merchants, joint partners, or auctions, he is not entitled to use these methods of marketing the growers' produce.  Any expense incurred for such services, without the growers' permission, cannot be charged to the growers.

A commission merchant is "any person engaged in the business of receiving in interstate or foreign commerce any perishable agricultural commodity for sale, on commission, or for or on behalf of another."  7 U.S.C. § 499a(b)(5).  The relevant contract provision reads that "S & S shall with the help of its marketing partners determine the price at which the product is sold."  Additionally, the contract requires that "[t]he product net sales price received by S & S, less eight percent (8%) sales commission, shall be paid by S & S to Grower."  Two commissions of eight percent were deducted from the sale price of the fruit before it was given to Spring Lake — one by SunBelle and one by S&S.

20

The parties dispute the significance of 7 C.F.R. § 46.32(c) to this case. According to S&S, paragraphs 2 and 3 of the contract specifically authorized S&S's use of SunBelle's services and the charging of SunBelle's commission. Paragraph 2 authorizes S&S to use the "help of its marketing partners," and paragraph 3 provides that growers will be paid the "net sales price received by S & S, less [the] eight percent (8%) sales commission" for S&S. S&S argues that SunBelle was a "marketing partner" whose use was specifically authorized by paragraph 2, and the deduction of SunBelle's commission was authorized because it was contemplated by the "net sales price" language of paragraph 3.

According to Spring Lake, the required "specific authorization" was not provided in the contract, either with regard to the use of a commission merchant or with regard to the authorization of a second commission. Because the contract did not explicitly permit these expenses, S&S should not have been permitted to "pass them on" to Spring Lake — i.e., S&S should not be permitted to take a commission after SunBelle had already taken its commission.

We affirm the district court's holding that S&S was not allowed to deduct a second commission from the sales receipts passed on to Spring Lake. Section 46.32(c) required S&S to obtain express permission before using the services of commission merchants. SunBelle was a commission merchant. See 7 U.S.C. § 499a(b)(5). Here, the contract was not express enough: its reference to

21

"marketing partners" in paragraph 2 does not make clear that S&S would engage with a commission merchant to sell the berries, and the "net sales price" language of paragraph 3 is not sufficiently specific to have alerted Spring Lake that double commissions would be charged. Because the contract did not "specifically authorize" the use of SunBelle's services, we conclude that S&S could not deduct two commissions from the amount paid to Spring Lake.

## III.    CONCLUSION

We affirm the district court on the issue of the double commission. We reverse the district court's order upholding the damages award against S&S based on inadequacies in its records and the propriety of looking to market data instead of the ascertainable price actually agreed upon by the parties. On remand, the district court should calculate the damages due to Spring Lake in a manner consistent with this opinion. Accordingly, this case is

**AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.**

22